# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JOHN BUTSINAS,

      Defendant-Appellant.

<div style="float:right">

UNPUBLISHED
January 23, 2018

No. 327796
Macomb Circuit Court
LC No. 2014-001163-FH

</div>

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JOHN BUTSINAS,

      Defendant-Appellant.

<div style="float:right">

No. 327799
Macomb Circuit Court
LC No. 2014-000167-FC

</div>

Before: SHAPIRO, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant of five counts of first-degree criminal sexual conduct for sexually assaulting the young daughter of his live-in girlfriend over a four-year period. The jury also convicted defendant of two counts of witness intimidation.

The prosecution presented sufficient evidence to support the witness intimidation convictions and we affirm. However, the prosecution withheld material exculpatory evidence related to the CSC charges. Had this evidence been provided to the defense, the likelihood of a different result is great enough to undermine our confidence in the outcome of the trial. We vacate defendant's CSC convictions and remand for a new trial.

## I. BACKGROUND

For several years, defendant lived with his girlfriend, Elizabeth Smith, and her three daughters. The family first lived in a mobile home and then in a house on Crocker Street. In 2013, Smith's middle daughter, Kr, reported to a friend that defendant had sexually abused her

1

throughout the previous four years. At the time of this disclosure, Kr was 12 years old. When interviewed by the police, Kr claimed that defendant had repeatedly engaged in forcible penile-vaginal penetration with her since she was eight years old (2008). Following this disclosure, Smith accompanied her daughter to the hospital. But Kr refused to allow a doctor to conduct a sexual assault examination, and no examination was ever performed.

At trial, Kr described in detail assaults that occurred several times each week, usually at night while everyone else was asleep. She recounted that on one occasion while watching television with her sister and mother, defendant asked to her accompany him upstairs. When she arrived, defendant was lying naked on his bed. Elizabeth Smith recalled that she once awoke in the middle of the night and discovered defendant and Kr in the bathroom with the door closed.

Smith claimed that she never suspected that defendant had sexually abused Kr. She conceded that defendant once asked Kr for a "blow job," but defendant was partially asleep and believed Kr was Smith. Smith also found it "weird" when defendant asked Kr if she had gotten her period.

Kr's older sister, Ka, testified that she had always felt uncomfortable around defendant and found it inappropriate that he asked Kr and her youngest sister, C, to give him back and foot massages. In 2010, when Kr was 10 years old, Ka reported her suspicions about defendant's behavior to a social worker who had previously assisted the family. The first page of the Child Protective Services report states:

> This family has a lengthy history with CPS. The children were previously in foster care due to the home environment. There is a trend found in the CPS history for deplorable environments in the home with her [sic] mother. In 2007 there was a CAT I for Sexual abuse by the Natural father, he no longer has his parental rights.

The 2010 CPS investigation included forensic interviews of Ka and Kr. Both denied that defendant had committed any sexual abuse, and the investigator found no ground for intervention. The CPS report of this sexual abuse investigation was not provided to the defense, and this omission figures prominently in our decision to reverse defendant's CSC convictions.

After Kr's revelation of abuse in 2013, CPS again initiated an investigation. Deborah Spork, a CPS investigator, prepared a lengthy report of the multiple interviews conducted and the actions taken. Like the 2010 report, the 2013 report contains exculpatory information and was not provided to the defense. Ultimately, the jury convicted defendant of five counts of committing CSC against Kr.

## II. SUFFICIENCY OF THE EVIDENCE: WITNESS INTIMIDATION

Margaret Dunn testified that in 2013, she contacted CPS to report defendant's alleged sexual abuse of Kr. She accompanied Smith and Kr to the hospital. Margaret asserted that she could hear defendant's voice over a cell phone while he spoke to Smith at the hospital. Defendant continually asked Smith who had contacted CPS and threatened, "[A]s soon as I find out who called and told, I will fucking kill them." Margaret and her husband, Jason Dunn, described that defendant subsequently stalked their home. Jason further testified that defendant

2

asked him to help "make all this, the allegations . . . go away." William Marrow, defendant's close friend, testified that defendant asked him to assist him in various nefarious acts designed to convince Smith and Kr to drop the charges.

Defendant contends that this evidence was insufficient to support his convictions of intimidating witnesses Margaret and Jason Dunn. We review such challenges de novo, viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in favor of the jury's verdict, to determine if a rational jury could find the elements of the offense established beyond a reasonable doubt. *People v Pinkney*, 316 Mich App 450, 467-468; 891 NW2d 891 (2016).

The prosecution charged defendant under MCL 750.122(3), which proscribes witness intimidation as follows:

> A person shall not do any of the following by threat or intimidation:
>
> (a) Discourage or attempt to discourage any individual from attending a present or future official proceeding as a witness, testifying at a present or future official proceeding, or giving information at a present or future official proceeding.
>
> (b) Influence or attempt to influence testimony at a present or future official proceeding.
>
> (c) Encourage or attempt to encourage any individual to avoid legal process, to withhold testimony, or to testify falsely in a present or future official proceeding.

MCL 750.122(9) further provides:

> This section applies regardless of whether an official proceeding actually takes place or is pending or whether the individual has been subpoenaed or otherwise ordered to appear at the official proceeding if the person knows or has reason to know the other person could be a witness at any official proceeding.

The intimidation of a witness in a judicial proceeding is associated with the common-law offense of obstructing justice. *People v Vallance*, 216 Mich App 415, 419; 548 NW2d 718 (1996). The coercion of witnesses, an example of obstructing justice, "is complete with the attempt through threats and coercion to dissuade a witness from testifying." *People v Tower*, 215 Mich App 318, 320; 544 NW2d 752 (1996). The crime requires a specific intent. *Id*. at 320-321. The defendant's acts or statements must be "unequivocally referable" to the crime. *Id*. at 321. However, there is "no talismanic requirement that a defendant must say, 'Don't testify' or words tantamount thereto." *Id*. a 322 (citation and quotation marks omitted). Rather, the totality of the circumstances must reasonably support an inference that the defendant intended to dissuade the person from testifying. *Id*. at 322-323.

The record evidence does not support that defendant intimidated Margaret Dunn during his telephone conversation with Smith while Smith was at the hospital with Kr. Neither

Margaret nor Smith ever claimed that defendant was aware of Margaret's presence or realized that she could hear his end of the phone conversation. Moreover, defendant's statement did not refer to Margaret attending as a witness, testifying, or giving information at any proceeding. Rather, defendant threatened harm in retaliation for the past act of reporting the abuse to CPS. Because the threat made by defendant while on the phone with Smith was not intended to discourage Margaret from testifying, his words cannot support a witness intimidation charge.

But the jury was entitled to infer that defendant's two appearances at the Dunn house, which included honking his horn, revving his engine, shouting, and demanding to speak to Jason Dunn, were intended to intimidate Margaret and to dissuade her from testifying. And a related event also supplies sufficient circumstantial evidence to qualify as witness intimidation. On one of the nights that defendant revved his car engine outside the Dunns' home, Jason Dunn went outside to confront him. Defendant had his phone out and was "videotaping [the Dunns'] home and all of [their] cars." When asked why he was doing that, defendant told Jason that the Dunns "messed with the wrong people this time, and that [they] were manipulators and [they] would not take other people's kids this time." Jason called the police, who eventually apprehended defendant and impounded his car. According to both Jason and Margaret, defendant again had no reason to be at the Dunn house. Viewed in the light most favorable to the prosecution, *Pinkney*, 316 Mich App at 467-468, this evidence sufficed to support defendant's witness intimidation convictions.[1]

III. THE CPS REPORTS: SUPPRESSION

Defendant raises numerous challenges to his CSC convictions. We begin by considering defendant's arguments related to two CPS reports, the first created in 2010 and the second in 2013. Both contained valuable exculpatory and impeachment evidence, the combined absence of which during the trial undermines confidence in the guilty verdicts rendered. Given the contents of the reports, the prosecutor was obligated to provide them to the defense before the trial. By withholding the reports, the prosecution violated its obligation under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), and denied defendant the opportunity to present a significant defense.

We begin by reviewing the legal fundamentals. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Due process imposes on the prosecution an "inescapable" duty "to disclose known, favorable evidence rising to a material level of importance." *Kyles v Whitley*, 514 US 419, 438; 115 S Ct 1555; 131 L Ed 2d 490 (1995). Favorable evidence includes both exculpatory and impeachment material relevant to guilt. *Id*. at 432, 450. To establish a *Brady* violation, a defendant must prove that: (1) the state possessed evidence of exculpatory or impeachment value to the defendant; (2) the prosecution suppressed the evidence; and (3) the evidence, viewed in its totality, was material, meaning that had the evidence been disclosed to

---

[1] It bears noting that during closing, defense counsel only argued that defendant was not guilty of witness intimidation because there were no charges pending at the time, which has no bearing on whether a defendant may be convicted of witness intimidation. See MCL 750.122(9).

4

the defense, a reasonable probability exists that the result of the proceedings would have been different. *People v Chenault*, 495 Mich 142, 150-151, 155; 845 NW2d 731 (2014).

The defense obtained the CPS reports only after the case had been submitted to this Court for decision. We permitted the parties to extensively brief the *Brady* issues generated by the reports' disclosure. The prosecution's briefs centered on an argument that defendant could not establish a *Brady* violation because no evidence had been suppressed. The prosecution denied that it had ever possessed the CPS reports, while alternatively suggesting that defense counsel did. The record refutes both arguments. We first consider whether the prosecution suppressed the reports before analyzing their contents under the remaining aspects of the *Brady* framework.

## A. THE 2010 REPORT

Evidence that the prosecutor failed to disclose the 2010 CPS report first emerged during defense counsel's cross-examination of Ka. Ka testified on direct examination that during the time defendant lived with her family, she felt "very uncomfortable" with the manner in which he addressed her mother and her sisters, and argued with him frequently about it. She was also "very uncomfortable" with defendant's requests that her sisters give him foot and back massages. Based on this discomfort, Ka told the jury that she contacted "our former social worker who had been on the case before," and informed her "that there was a man who was living in the home that I was very uncomfortable with the way he was with my sisters." Ka continued, "And as far as I know, nothing came of the CPS report, but I did call and make a report." At the time of this CPS contact, Ka explained, Kr was 10 years old. Kr was 10 years old in 2010.

Defense counsel subsequently inquired, "One reason, maybe the main reason that you contacted CPS about back rubs and foot rubs is you knew about your father . . . ." An objection interrupted the question, which the trial court sustained. Later, with the jury absent, the court permitted defense counsel to amplify his objection for the record:

> THE COURT . . . Mr. Kaplan, you had an objection regarding the CPS report. Go ahead.
>
> MR. KAPLAN: Thank you, your Honor. I attempted to cross-examine Ka. . . . About the reason why she made a CPS report some time in 2009/2010. She said she was concerned about back rubs and foot rubs. But, she told Sergeant Abro that she was put on edge due to a previous incident involving Kr's biological father and his previous sexual abuse.
>
> Now, your Honor, we have a Sixth Amendment right to present a defense. We have a right to follow up on a topic raised by [the prosecutor]. He opens the door for her to say, oh, I made a CPS report, which shouldn't have been admissible any way. And now, I have the right to follow up on my Sixth Amendment right to cross-examine, and he objects. He can object all day, but I want the record to reflect that that would have been the testimony and we were precluded from presenting it, and his Sixth Amendment rights are being violated by that ruling.

5

The prosecutor responded that the information counsel sought was inadmissible under the "Rape Shield." Defense counsel contended that he didn't ask Kr whether her natural father had raped her, but whether she had filed a report "because she had concerns about prior sexual abuse involving her father." The court then ruled as follows:

> All right. *First of all, I reviewed the potential statements that Ka made from the CPS report*, and the fact that she was concerned that her sister might have previously been abused I find to be irrelevant, I find it to be prejudicial, I find it to be too far removed, and I don't think anything that I saw in the report suggested to me that it prompted her to make any sort of false or inappropriate report to CPS this time. I think it's irrelevant. [Emphasis added.]

We quote this portion of the record in detail because the context evinces that the trial court reviewed the 2010 CPS report. The 2010 report, quoted above, specifically references a 2007 investigation of "Sexual abuse by the Natural father." Ka's mention of the back and foot massages, and her discomfort with defendant's behavior toward her sisters, related to events that occurred before or during 2010, and were subjects discussed in the 2010 CPS report. Defense counsel's objection referenced the 2009/2010 timeframe. The trial court's statement that "I reviewed the potential statements that Ka made from the CPS report" is consistent with the court having been provided with a copy of the 2010 report.

Our interpretation of the testimony matches that of the prosecution. When defendant's appellate counsel initially attempted to obtain the 2010 and 2013 CPS reports, the prosecution averred in a pleading filed with this Court that it did not have the reports in its possession. However, the prosecution's response continued, "The appellate record suggests that Judge Faunce reviewed these items *in camera* during the trial, but it is unclear if she still maintains possession of them."[2] That interpretation of the appellate record, untainted by the events that unfolded after the CPS reports were obtained and revealed by the defense, strikes us as a fair appraisal consistent with the transcript.

Our conclusion that Judge Faunce had the 2010 report is buttressed by Judge Faunce's February 27, 2017 opinion denying defendant's motion for a new trial. Judge Faunce's opinion provides in relevant part:

> [D]efendant contends that the Court limited his cross-examination of [Ka] regarding a prior CPS complaint she had made, particularly as to allegations of sexual abuse by [Kr] against her biological father. Defendant argues that if [Kr] made prior false allegations of sexual abuse against someone else during the same time period as her allegations against him, this evidence was critical to impeach her.

---

[2] In a more recent filing, the appellate prosecutor contends "that it is . . . far from clear what document" the judge is referring to in the relevant portion of the transcript that we have cited, above. Specifically, the prosecutor believes the judge may have reviewed and held inadmissible the 2013 CPS report during defendant's cross-examination of Ka. We discern no such ambiguity given the questions posed to Ka at the time the objection arose. The issues under discussion were not the subjects of the 2013 CPS report.

<center>* * *</center>

At trial and outside the presence of the jury, the Court stated that it reviewed the statements made by [Ka] in the CPS report. . . . The Court indicated that any concern [Ka] had that [Kr] may have previously been abused was irrelevant, prejudicial, and too far removed. . . . The Court concluded that nothing in the CPS report suggested a false or inappropriate report to CPS in this instance . . . . Defendant has not established the relevancy of the prior CPS report.

We trust that the trial court meant what it said: it reviewed a CPS report, and not a police report. The trial court's opinion reflects that the court understood that defendant's objection to the curtailment of his cross-examination related to a "prior report" of sexual abuse. The 2010 CPS report meets this description. The 2013 report does not.

No evidence supports the prosecution's fallback argument that defendant's trial counsel had a copy of the 2010 report. At the *Ginther* hearing, counsel readily admitted that he knew the CPS reports existed, and that he had been provided with a copy of a Texas CPS report. He denied having a copy of the Michigan CPS reports. The trial court addressed this issue in its opinion denying defendant a new trial in response to defendant's assertion that "he was denied his right to confrontation because the prosecutor failed to provide him all of the CPS reports." The court recounted that the discovery unit clerk for the Macomb County Prosecutor's office had testified that "there was no Michigan CPS report in defendant's discovery packet, but there was a Texas CPS report."

We have no reason to doubt the trial court's statements that it reviewed the CPS report generated by Ka's complaint about back and foot massages, and that the defense was not provided a copy. This evidence satisfies us that the prosecution possessed and suppressed the 2010 report.[3]

Ultimately, however, the dispute about whether the trial court had or did not have the 2010 CPS report is a tempest in a teapot. The prosecution knew that CPS reports had been made in 2010 and 2013.[4] The prosecution listed as a witness Spork, the CPS investigator for the 2013 report. Michigan law required the prosecution to review Spork's 2013 report, MCL 722.628b(1); the 2013 report referenced the 2010 report. If the prosecution had the CPS reports in its possession and failed to share them with the defense, it violated *Brady*. In the unlikely event that the prosecution neglected to obtain either or both of the reports, it also violated its *Brady* obligations.[5]

---

[3] The prosecution has not suggested that trial court somehow obtained the CPS report on its own.

[4] If the prosecution was unaware of the 2010 CPS report, which we doubt, it became aware of the report during the trial, and was obligated to obtain a copy at that time.

[5] Our difficulty in unravelling this Gordian knot stems in part from the trial court's violation of MCR 6.210(C)(3)(d), which mandates that a trial court "seal and preserve" protected material "for review in the event of an appeal." The record provided to this Court did not include either CPS report, despite that the trial court admitted on the record to having reviewed at least one of

<center>7</center>

The prosecution need not have had actual possession of 2010 report to have violated *Brady*, because "[t]he government is held responsible for evidence within its control, even evidence unknown to the prosecution, without regard to the prosecution's good or bad faith." *People v Stokes*, 312 Mich App 181, 190; 877 NW2d 752 (2015). "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v Agurs*, 427 US 97, 110; 96 S Ct 2392; 49 L Ed 2d 342 (1976). The prosecution has a duty to learn about and disclose information "known to the others acting on the government's behalf in the case. . . ." *Kyles*, 514 US at 437. Obviously, this would include any information known to the police and investigators working as part of a police and prosecution team.

Although CPS is a government agency distinct from the police, its workers regularly supply evidence in support of a prosecution. CPS workers did so in this case. The 2013 CPS report references dozens of telephone contacts with Sergeant Abro, the lead detective in the case. The 2013 CPS report references an investigation undertaken by CPS in 2010, during the time that Kr claimed to have been regularly abused by defendant.

In *Kyles*, 514 US at 433, the United States Supreme Court reiterated that in situations involving only general requests for *Brady* material, a duty exists on the part of the government to produce exculpatory material when suppression of the evidence would result in a denial of the defendant's right to a fair trial. This rule assigns to prosecutors the "responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached." *Id*. at 437. The Court further observed, "This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id*. CPS reports in particular fall within this category of evidence. *Pennsylvania v Ritchie*, 480 US 39, 58; 107 S Ct 989; 94 L Ed 2d 40 (1987).

The police and the prosecutor knew that Ka had made a sexual misconduct complaint implicating defendant in 2010 that was not substantiated; certainly another part of the prosecution team, the CPS, was privy to this information. The 2010 complaint did not lead to criminal charges. That fact alone should have suggested to the prosecution that the report might contain information favorable to the defense. If the prosecution consciously elected to forego review of the 2010 report, it violated its obligations under *Brady*; an ostrich approach contravenes *Brady*'s commandment that prosecutors make an effort to locate exculpatory evidence as well as evidence of guilt. We conclude that the prosecution was obligated to obtain the 2010 report as part of its investigation of this case. *Kyles*, 514 US at 438.

---

them. The record also did not include Kr's psychiatric records from Havenwyck, which the trial court also acknowledged having reviewed. After several requests by this Court, the trial court located the Havenwyck record, which inexplicably had not been maintained in the official court record.

## B. THE 2013 REPORT

The 2013 CPS report was authored by Spork, who regularly communicated with Detective Abro about Kr's 2013 disclosure. Spork testified that if the prosecution had requested the report, it would have been provided. If Spork failed to provide the report to the police, she would have violated MCL 722.628b(1) and PSM 713-10, Children's Protective Services Manual, July 1, 2016, p 1.

The 2013 report was in the government's control and the prosecution is therefore held responsible for its production regardless of actual possession. *Chenault*, 495 Mich at 150; *Stokes*, 312 Mich App at 190. Moreover, MCL 722.627(2)(b) provides that reports filed with the Department of Health and Human Services are available to a law enforcement agency investigating a report of known or suspected child abuse. In 2013, this would have included the CPS. Because the 2013 report to CPS triggered the criminal investigation of defendant, the prosecution was duty bound to obtain a copy of the report. See *Kyles*, 514 US at 437.

## IV. THE CPS REPORTS: REMAINING *BRADY* ANALYSIS

## A. THE 2010 REPORT

The 2010 CPS report was prepared following Ka's September 13, 2010 complaint to a social worker that she feared for her younger sisters' safety. On September 21, 2010, a CPS worker forensically interviewed both Kr and C regarding their relationships with defendant. According to the report, Kr "stated that she likes [defendant] and denies that there is anything that she does not like about him." Indeed, Kr indicated, "the only person in the house that does not like [defendant] is [Ka]. She reported that she is unsure why but thinks that she was too old when he met their mom."

During their forensic interviews, both Kr and C described a game that defendant previously played with them during which he would kiss their cheeks and neck. Both maintained that defendant had stopped playing this game approximately two years earlier, deeming them too old and "grown up." The report further stated that "[e]ach girl reported that they feel safe at home with either their mother, sister, or [defendant] at the home." The CPS investigator concluded that "there is not a preponderance of evidence that there has been physical neglect or sexual abuse in home."

This evidence would have supplied the defense with favorable and material exculpatory and impeachment information.

In *Chenault*, 495 Mich at 150, the Supreme Court explained that "[e]vidence is favorable to the defense when it is either exculpatory or impeaching." The information in the 2010 CPS report was both. Midway through the period of time during which Kr alleged that defendant had been sexually abusing her on a regular basis, Kr denied that there was "anything she did not like" about defendant, and claimed to feel safe when in his care. The forensic interviewer failed to elicit any information suggestive of regular, ongoing sexual assaults, or any sexual assaults at all.

The results of Kr's 2010 forensic interview contradicted Kr's trial testimony. Had defense counsel been aware of the results of the forensic examination, he could have used it both

9

for impeachment and as a framework for a defense. "The goal of a forensic interview is to obtain a statement from a child, in a developmentally-sensitive, unbiased, and truth-seeking manner, that will support accurate and fair decision-making in the criminal justice and child welfare systems." State of Michigan, Governor's Task Force on Child Abuse and Neglect and Department of Human Services, Forensic Interviewing Protocol (3rd ed), p 1. A forensic interview "is investigative in nature and used to obtain information to help determine whether abuse has occurred." Practice Guidelines: Forensic Interviewing in Cases of Suspected Child Abuse, APSAC (2012), p 3. Supporting that goal, forensic interviews must be conducted by trained professionals who do not "have an on-going or a planned therapeutic relationship with the child" and be carried out in a "hypothesis-testing rather than hypothesis-confirming" manner. Michigan Forensic Interviewing Protocol, p 1. Such interviews are "essential" to child sex abuse investigations because "the alleged victim and alleged perpetrator may be the only people who know what really happened," making the accuracy and truth of the victim's statement of paramount importance. Forensic Interviewing: A Primer for Child Welfare Professionals, Children's Bureau Child Welfare Information Gateway, p 2, <https://www.childwelfare.gov/ pubPDFs/forensicinterviewing.pdf> (accessed August 23, 2014). While it is certainly possible that the forensic interviewer did a poor job, we may not discount the potential power of this evidence. See *Wearry v Cain*, __ US __; 136 S Ct 1002, 1007; 194 L Ed 2d 78 (2016) ("[T]he state postconviction court improperly . . . emphasized reasons a juror might disregard new evidence while ignoring reasons she might not[.]").

Kr's 2010 statements to the CPS workers also exposed bias on the part of Ka that could have been used by the defense during Ka's cross-examination. According to statements attributed in the report to Kr, Ka disliked and resented defendant. Evidence of Ka's feelings could have fueled a more effective cross-examination. The evidence contained in the 2010 CPS report easily meets *Chenault*'s first prong.

Our Supreme Court recently emphasized regarding *Brady*'s third aspect, materiality:

A reasonable probability [of a different result] is a probability sufficient to undermine confidence in the outcome. This standard does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The question is whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence. In assessing the materiality of the evidence, courts are to consider the suppressed evidence collectively, rather than piecemeal. [*Chenault*, 495 Mich at 150-151 (quotation marks and citations omitted).]

Particularly with respect to Kr's forensic interview, the 2010 CPS report was material. Given the goals and methodology of forensic interviews, Kr's failure to reveal any hint of sexual abuse when she was professionally questioned during the period of alleged abuse constituted powerful evidence relevant to her credibility. Indeed, we are hard pressed to identify another potential source of evidence more pertinent to whether Kr's allegations should have been believed. That a trained CPS forensic interviewer obtained no evidence of abuse in 2010 casts substantial doubt on Kr's veracity.

Our dissenting colleague would hold that the CPS reports were immaterial, as Kr's denials of sexual contact during the forensic exam were consistent with her testimony that fear of defendant kept her from disclosing the abuse. We find that contention unpersuasive. Exculpatory or impeachment evidence need not conclusively prove a defendant's innocence. Rather, such evidence includes information calling into question the reliability of a critical witness. *Giglio v United States*, 405 US 150, 154; 92 S Ct 763; 31 L Ed 2d 104 (1972). That the prosecution could offer an explanation for the 2010 forensic interview results—Kr's fear of defendant—does not mean that the jury would have accepted that explanation. Further, sexual abuse investigators are well aware that perpetrators frequently threaten to harm children who disclose the abuse. Interviewers are trained to empower children to speak freely despite the threats; indeed, that is one of the central goals of an interview. Perhaps the forensic interviews were conducted improperly, or the 10-year-old Kr succeeded in overcoming the methods used by a trained professional to ferret out the truth. That is for a jury to decide.

Moreover, we presume that defense counsel would not have used the report merely to impeach Ka or Kr. Rather, armed with the report, defendant likely would have called the CPS forensic examiner to educate the jury regarding the techniques routinely employed to elicit truthful information in similar circumstances. Alternatively, defendant would have called his own expert witness to present this testimony. In either event, defendant could have used the CPS reports to develop a defense strategy focusing on the general accuracy and reliability of forensic interviews and interviewing techniques.

In evaluating the materiality of the both CPS reports, we have also considered that the evidence against defendant was far from overwhelming. The prosecution's case hinged on Kr's credibility, bolstered by Ka's testimony. The CPS reports would have undermined the credibility of both witnesses. While defense counsel was able to impeach these witnesses on small and rather inconsequential points, the information contained in the CPS reports was far more damaging to their credibility and the prosecution's case than any information available to defendant before the trial. Further, we highlight that *Brady*'s materiality inquiry requires us to consider whether in the absence of the suppressed evidence the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 US at 434. A jury could believe that Kr did not reveal the abuse to the forensic examiner because she was frightened of defendant. But the fact that she did not make any statements consistent with abuse during that examination "put[s] the whole case in such a different light as to undermine confidence in the verdict." *Id*. at 435.

## B. THE 2013 CPS REPORT

The 2013 report also contained material information favorable to the defense. Contrary to Sergeant Abro's trial testimony that Care House would not provide forensic interviews for children of the victim's age, the report indicates that Abro informed Spork that "he has decided to not do a Care House with [Kr]. Instead he will directly interview her. . . ." A Texas investigator spoke with Spork and reported that Abro had vetoed a forensic examination because "Kr was forensically interviewed in [Michigan]" and Abro did not want to risk any inconsistencies.[6] Defendant could have used this information to impeach the sergeant. The CPS

---

[6] It appears that Kr was not interviewed under a forensic interview protocol in 2013.

11

report also describes Kr's interview with Abro, at which Spork was present. Kr refused to give any details about the sexual acts perpetrated against her. Although Kr testified at trial that the assaults all occurred at night while everyone was sleeping, she told Abro that they occurred while her mother was at work. This inconsistent information also could have been used to impeach Kr and test her credibility.

The report supplies information that could have impeached Ka's credibility as well. When Smith took Kr and C to Texas, they stayed in the family home of relatives, Laura and Alvin Daugherty. Alvin Daugherty, a Texas sheriff's deputy, was in regular contact with Sergeant Abro. Within a week after Kr and C arrived in Texas, Laura Daugherty reported to Spork that Ka had "continuously" contacted Alvin Daugherty at work. Spork wrote:

> She [Laura Daugherty] reported Ka has contacted him many times since receiving the number from DHS (MI). She is considering getting a PPO against Ka due to the harassment thus far. She stated Ka is upset due to she and Mr. Daugherty not providing her information on Kr and Ca. . . . Her concern is for her husband's safety due to the harassment by Ka.

Ka was one of the prosecution's strongest witnesses. Evidence contained in the 2013 CPS file suggests that Ka harbored a bias against defendant, and reinforces the evidence contained in the 2010 CPS report that suggested motives to testify against defendant.

We need not decide at this time whether the 2013 report, standing alone, was material under *Brady*. We are confident that the prosecution's suppression of the 2010 and 2013 CPS reports collectively denied defendant a fair trial. "Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.' " *Wearry*, 136 S Ct at 1006 (citations omitted). This does not mean that a defendant must prove that he would likely been acquitted had the new evidence been used at the trial. *Id*.

In *Wearry*, the United States Supreme Court chastised a state court because it "improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively[.]" *Id*. at 1007. We will not make the same error. As we have noted, the prosecution's case rose or fell on Kr's credibility and, to a lesser but nonetheless substantial extent, the credibility of Ka. No forensic or physical evidence supported that defendant had committed criminal sexual conduct. Nor did any medical evidence corroborate Kr's testimony that she had been vaginally raped repeatedly over a four-year period. No one witnessed the alleged assaults. Viewing the evidence holistically rather than in a piecemeal fashion, the information contained in the CPS reports would have provided the defense with powerful material to challenge the credibility of both Kr and Ka. Its absence during the trial undermines our confidence in defendant's CSC convictions.[7]

---

[7] We also need not analyze defendant's claim that his trial counsel was ineffective for failing to discover the report earlier and failing to use its contents as impeachment evidence. Defendant now has the report, and may use the information it contains when preparing for his new trial.

12

## V. HAVENWYCK RECORDS

Defendant challenges his inability to access Kr's sealed medical record from her stay at Havenwyck Hospital immediately following her sexual abuse report. Defendant believes that Kr underwent a pelvic examination at Havenwyck and that the results would show no evidence of any penetration. Defendant's belief is founded upon a comment in a report generated by Texas CPS. The Texas agency became involved when Smith sent Kr and C to stay with relatives in that state. On July 8, 2013, Texas Special Investigator Billy Aldrich documented that he spoke with Spork and inquired whether he should pursue a medical examination of Kr. Aldrich asserted that Spork responded, "a doctor in Michigan examined [Kr] and found no evidence of penetration." Spork did "not think the doctor was a trained sexual assault examiner," however. Ultimately, no medical exam was conducted in Texas.

The trial court conducted an in-camera review of the Havenwyck records, determined that they were not relevant, and found no exculpatory evidence within. This Court ultimately obtained the Havenwyck record. Our review reveals that no pelvic examination was conducted at Havenwyck. The sealed Havenwyck record does not prove or disprove that Kr received a pelvic exam at some point. The trial court did not err in refusing to produce the Havenwyck record for defendant's inspection.

## VI. MARY NOLAN

Defendant contends that trial counsel was ineffective for failing to call Mary Nolan as a defense witness at trial. A defendant asserting a claim of ineffective assistance of counsel bears the burden of establishing that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Decisions regarding whether to call or question witnesses are presumed to be matters of trial strategy. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "[T]he failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). " 'A substantial defense is one that might have made a difference in the outcome of the trial.' " *People v Chapo*, 283 Mich App 360 371; 770 NW2d 68 (2009) (citation omitted).

At the *Ginther* hearing, Nolan testified that she lived with defendant and the Smith family during the relevant time period and never saw anything inappropriate between defendant and Kr. She also contradicted Kr's description of where she slept in the mobile home and how defendant was able to isolate her to commit his crimes. Nolan claimed that after she heard the accusations she asked Kr if defendant had done anything and Kr said no. Trial counsel testified that he decided not to call Nolan as a witness because she was a heroin addict who spent time in jail during the relevant timeframe and therefore was less than credible. Nolan's background supplied a reasonable strategic basis to forego calling her as a defense witness, and we find no ineffective assistance in this regard.

## VII. STD DEFENSE

Defendant contends that at the time of the alleged assaults he suffered from a sexually transmitted disease, which Kr would have contracted had he sexually assaulted her. Defendant contends that the trial court infringed on his right to present a defense by excluding the medical evidence he proffered and, alternatively, that defense counsel was ineffective for failing to investigate this defense in a timely fashion.

On the first day of trial, defense counsel made an "offer of proof" that defendant "suffered from gonorrhea" and had infected Smith. According to defense counsel, both received treatment. Defense counsel continued, "Our defense then would be that it could be, perhaps, maybe that the young girl would have also contracted gonorrhea." Counsel admitted that "at this point, I don't know what witnesses we're presenting. So it might be a threshold issue as to whether we have sufficient evidence to satisfy you." Counsel proposed that Smith would testify that she had contracted gonorrhea, that she had sexual relations only with defendant, "and, therefore, there's a presumption then that she caught it from him. Daughter should have it or might have it." The court ruled that the evidence was not relevant "until I have an expert tell me that it is. So it's not coming in front of the jury until I hear from an expert. Then, I can make a ruling on that motion."

On the second day of trial, defense counsel advised that he had located a "venereal disease specialist" who "would make himself available to the court." Counsel stated that "[a]s soon as I get his information from my assistant, I would like to add him to our witness list," and would make an "offer of proof" when he had the doctor's name. The prosecutor objected, arguing that "this is just extremely untimely." Defense counsel then shifted gears slightly, contending that "[t]he only witnesses that we would elicit the testimony from are the complainant and her mother, who have already been on the witness list, and potentially, Mr. Butsinas, should he testify." The trial court responded: "Okay. There would be a doctor that diagnosed this venereal disease, then the expert testify about the transmission of it, and the time frame that he allegedly had it. So the diagnosis and the cure date." Counsel suggested that he could get that information into evidence through "a different witness," arguing that "we believe that a different witness had contracted gonorrhea, and she should testify to that on the stand. And if then, if she does, then it would go to her having personal knowledge of having that gonorrhea."

The court insisted that "[y]ou'd still need a doctor," and opined that "this is adding a lot of witnesses and expert testimony at the last minute." After additional protest by the prosecutor, the court denied defendant's request, reasoning, "There's too many experts who would have to be involved in this."

On the fourth day of trial, defendant raised the issue again, focusing on Smith's awareness of her diagnosis and offering the name of an expert:

> The offer of proof is we believe that [Smith] had been able to be questioned in regards to whether or not she had gonorrhea, whether or not she was monogamous with [defendant], and that she had personal knowledge that [defendant] was treated for gonorrhea, we do have prescriptions for

14

Azithromycin, which has been used to treat gonorrhea for [defendant] in the years of 2006 through 2013, and that they took that prescription medication together.

I did consult with Dr. Bishir Al-Ujayli, . . . who's a medical doctor from Rochester Hills. He is on the American Board of Infectious Diseases, is part of the infectious disease Society of America, completed a fellowship at Henry Ford Hospital, has been a doctor for over 25 years, and would have testified to the transmission rates of gonorrhea.

The court refused to change its prior ruling.

Following defendant's appeal, we remanded to the trial court to consider defendant's motion for a new trial based on the performance of defense counsel. At the *Ginther* hearing on remand, defendant presented the testimony of four witnesses regarding defendant's sexually transmitted disease: Jennifer Veltman, M.D., Dr. Richard Kushner, Smith, and defendant. Appellate counsel also introduced into evidence prescription records indicating that defendant had been treated with Azithromycin on six occasions between November 30, 2007 and August 4, 2009. Defendant presented a single lab report showing that he tested positive for chlamydia, not gonorrhea, on November 26, 2007, and several reports indicating that he has tested positive for Hepatitis C since at least April 2007.

Dr. Steven Kushner prescribed the Azithromycin, according to the prescription records; he apparently practiced with Dr. Richard Kushner, the witness called by defendant. Dr. Richard Kushner testified that he obtained a "sample" from defendant on November 26, 2007, that was sent to the laboratory. It was positive for chlamydia. Assuming that defendant took the Azithromycin as prescribed on November 30, 2007, Dr. Kushner opined, he would have been cured. Dr. Kushner was not asked about any of the prescriptions for Azithromycin dated after November 30, 2007, and Dr. Steven Kushner did not testify.

Dr. Veltman testified that the transmission rate for chlamydia is 40% for a single exposure, and that "the more acts, the more likely it would be that chlamydia would be transmitted." Dr. Veltman explained that the treatment for chlamydia is a single, two-gram dose of Azithromycin given at one time. A patient who takes the medication as directed "would be cured." Azithromycin is also used to treat a number of other illnesses, Dr. Veltman admitted, including "pneumonias or upper respiratory infections," sinus infections and other bacterial infections. She added, "It's probably one of the most prescribed prescriptions by outpatient primary care doctors. . . . [I]t is prescribed with high frequency by primary care physicians usually for respiratory symptoms."

Smith testified that she had chlamydia three times while she was in a relationship with defendant, but she did not remember the years. She stated, "There were two times near the beginning of our relationship and one time in the Crocker house." The defense presented no medical records related to Smith. Defendant testified regarding the 2007 chlamydia diagnosis made by Dr. Kushner. He claimed that after taking the medication, he continued to have symptoms, and received another prescription. He became reinfected by having sex with someone other than Smith, and "for over a year," he and Smith passed chlamydia "back and forth."

Defendant contends that he was denied the right to present a defense by the trial court's preclusion of both lay and expert testimony regarding his sexually transmitted disease. We review de novo whether defendant suffered a deprivation of his constitutional right to present a defense. *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). The United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v South Carolina*, 547 US 319, 324; 126 S Ct 1727; 164 L Ed 2d 503 (2006). "[L]imitations placed on the accused's ability to present a fair and complete defense can, in some circumstances, be severe enough to violate due process." *Montana v Egelhoff*, 518 US 37, 61; 116 S Ct 2013; 135 L Ed 2d 361 (1996).

> Meaningful adversarial testing of the State's case requires that the defendant not be prevented from raising an effective defense, which must include the right to present relevant, probative evidence. To be sure, the right to present evidence is not limitless; for example, it does not permit the defendant to introduce any and all evidence he believes might work in his favor, [*Crane v Kentucky*, 476 US 683, 690; 106 S Ct 2142; 90 L Ed 2d 636 (1986)], nor does it generally invalidate the operation of testimonial privileges, *Washington v Texas*, [388 US 14, 23 n 21; 87 S Ct 1920; 18 L Ed 2d 1019 (1967)]. Nevertheless, "an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence" that is essential to the accused's defense. *Crane*, [476 US at 690] (citations omitted). [*Id*. at 63-64.]

Kr testified that the sexual abuse began in 2008. However, defendant presented no competent evidence that he had a sexually transmitted disease at any time after November 30, 2007. The only evidence that defendant had or was treated for chlamydia after 2007 came from defendant himself. As a lay witness, his testimony regarding his diagnosis (which can only be made by a laboratory) would be inadmissible expert testimony. MRE 701 provides that a lay witness's opinion testimony "is limited to those opinions or inferences which are . . . rationally based on the perception of the witness. . . ." Diagnosis of chlamydia in men requires laboratory analysis of "a urethral swab or first-catch urine specimen." Chlamydial Infections, <https://www.cdc.gov/std/tg2015/chlamydia.htm> (accessed August 14, 2017). Defendant could not have conducted this analysis alone; therefore, his opinion that he suffered from chlamydia after November 30, 2007 is not "based on the perception of the witness" and was inadmissible. See *State v Martin*, 142 NH 63, 65-66; 694 A2d 999 (1997) (holding that lay witnesses may not testify competently about medical diagnoses and generally may not draw conclusions which require specialized medical knowledge); *Doyle v State*, 1989 OK CR 85; 785 P2d 317, 322 (1989) ("[A] lay witness is not permitted to give an opinion calling for a medical diagnosis."). Accordingly, the trial court did not unconstitutionally deny defendant the right to present this defense.

Defendant insists that the trial court improperly excluded his pharmacy records from evidence at the posttrial hearing, and based on that error determined that he was not denied a defense. The pharmacy records, defendant asserts, revealed that he was prescribed Azithromycin numerous times over the relevant period to treat recurring bouts of chlamydia. Even if these records were admissible, they do not support defendant's defense. The records reveal that defendant was prescribed Azithromycin six times between November 30, 2007 and August 4,

2009. The records do not, however, identify the diagnosis leading to the prescription. Dr. Veltman testified that this antibiotic is one of the most common prescription medications employed by primary care physicians and can be used to treat any number of bacterial infections. Standing alone, the prescription of Azithromycin did not prove that defendant had chlamydia as opposed to one of the other common infections treated by the drug.

Similarly, defendant cannot establish that his trial counsel was ineffective for failing to investigate this potential defense sooner. Even without the time constraints of an impending trial, appellate counsel did not uncover and present laboratory tests establishing that defendant suffered from chlamydia any time after November 2007. As the only evidence uncovered posttrial (i.e., defendant's and Smith's testimony) was inadmissible to establish the proffered defense, defendant cannot make the necessary showing that he was prejudiced by counsel's failure to conduct timely research. See *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (to merit relief based on the ineffective assistance of counsel, the defendant must show that counsel's errors prejudiced the defense). This avenue of proof is not foreclosed on retrial, however, should more information be obtained.

## VIII. CHARACTER DEFENSE

Defendant further contends that the court unconstitutionally infringed on his right to present a character defense. Specifically, the court ruled that if defendant presented witnesses to testify that he was not likely to sexually abuse a child, the prosecutor would be permitted to offer rebuttal evidence that defendant was previously convicted of an assaultive crime. The rebuttal evidence was on point, the court declared, because CSC is an assaultive offense. Possibly as a result of this ruling, defendant did not call his proposed character witnesses at trial.

By choosing not to call his character witnesses at his trial, defendant waived his claim of error. See *People v Finley*, 431 Mich 506; 431 NW2d 19 (1988), adopting *Luce v United States*, 469 US 38; 105 S Ct 460; 83 L Ed 2d 443 (1984), and *People v Boyd*, 470 Mich 363; 682 NW2d 459 (2004). Were we affirming defendant's CSC convictions, no additional discussion of this issue would be necessary. However, on remand, defendant may again attempt to present his character witnesses. We therefore consider the validity of the trial court's evidentiary ruling.

We review for an abuse of discretion a trial court's decision whether to admit evidence and review any underlying legal issues de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). Generally, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." MRE 404(a). Pursuant to MRE 404(a)(1), however, a defendant may present "[e]vidence of a pertinent trait of character" and the prosecution may then "rebut the same." Even if defendant's proffered witnesses provided only reputation or opinion testimony regarding defendant's character, the prosecution would be permitted to rebut the evidence on cross-examination with "reports of relevant specific instances of conduct." MRE 405(a).

Yet, MRE 405(a) has its limits.

[T]he power of the state to rebut the character of defendant is limited to the trait or traits introduced by the defendant. A defendant does not open the door to any

and all evidence concerning his character merely by basing an argument on some aspects of his character. He opens the door only for evidence that his character is not what he claims it to be. [*People v Johnson*, 409 Mich 552, 561; 297 NW2d 115 (1980) (citations omitted).]

Here, defendant proffered witnesses to testify that it would not be in his character to commit CSC against a young girl. Defendant did not intend to establish that he is a peaceful, nonviolent person. Accordingly, defendant had no plan to open the door to evidence that he had committed violent or assaultive, nonsexual acts against adults in the past, specifically resisting arrest causing injury. Such evidence would not be admissible to rebut defendant's character claims. Accordingly, on remand, the challenged evidence to rebut defendant's character evidence will be inadmissible.

## IX. INVESTIGATION OF CASE

Under the guise of prosecutorial misconduct, defendant raises several challenges to the manner in which the prosecutor, police, and CPS investigated this case. Specifically, defendant cites CPS protocols requiring the agencies to work together to investigate and prosecute child sexual abuse cases, requiring medical examinations of sexual abuse victims, and requiring child sex abuse victims to be forensically interviewed. Defendant contends that the prosecutor, police, and CPS violated these protocols. As a result, the prosecutor "in effect" withheld evidence from the defense.

We discern no error in the state's failure to force Kr to submit to a medical examination. PSM 713-04, Children's Protective Services Manual, May 1, 2016, pp 2-3, provides that in cases of "suspected child sexual abuse," all children in the home must be given a medical examination "with exceptions in limited circumstances." The manual continues that the examination should be done within 72 hours otherwise "evidence may not be possible to obtain." *Id*. at 3. Here, Kr testified that the abuse had ended around her 12th birthday, months before she reported it. Accordingly, there would be no genetic material to gather. Defendant suggests that a young girl who was sexually assaulted so frequently over such an extended period would bear injuries that would remain clear long after the abuse ceased. However, defendant never presented an expert or even an expert's affidavit supporting that theory. In fact, Dr. Veltman testified that a young girl who is subjected to sexual abuse over a long period, beginning with "gentler" penetrations, may have no "injury or mucosal tears." Accordingly, defendant cannot establish prejudice as a result of the lack of a medical examination. Indeed, the CPS manual emphasizes, "Commonly accepted medical findings indicate that there is no physical evidence in the majority of sexual abuse cases." *Id*.

As medical evidence is usually not discovered, "[c]ase evidence will usually depend upon skilled interviewing of the child and collateral contacts." *Id*. The evidence in this case was not properly and reliably developed, defendant contends, because Abro purposefully avoided having Kr submit to a forensic interview. The record reflects that CPS officials or other state actors considered sending Kr to Care House for a forensic interview, but Abro indicated that the agency will not interview children over the age of 13. Accordingly, Abro interviewed Kr himself. He then refused the offer of a forensic interview of Kr while she was visiting family in Texas.

18

As previously noted, "The goal of a forensic interview is to obtain a statement from a child, in a developmentally-sensitive, unbiased, and truth-seeking manner, that will support accurate and fair decision-making in the criminal justice and child welfare systems." Supporting that goal, forensic interviews must be conducted by neutral, trained professionals. The forensic interviewing protocols do not describe age limits for children to be subject to such interviews. A review of Macomb County Care House's website reveals no stated age restrictions. And defendant presented an expert witness at trial—Dr. Katherine Keefer Okla—who testified that the forensic interview protocol applies to children, meaning "anyone . . . under the age of 18 years." As it is possible that Abro violated protocol by not securing a forensic interview, defendant may challenge the validity of the prosecution's evidence on this basis on retrial. And the defense may impeach Abro's testimony in this regard with his statement in the 2013 CPS report that he personally decided against submitting Kr to a forensic interview.

## X. PROSECUTORIAL MISCONDUCT

Defendant asserts that the prosecutor engaged in several inappropriate tactics, which denied him a fair trial. Defendant preserved only a portion of his challenges by raising timely and specific objections below. See *People v Brown*, 294 Mich App 377, 382; 811 NW2d 531 (2011). We review de novo defendant's preserved claims to determine if he was denied a fair and impartial trial. *People v Thomas*, 260 Mich App 450, 453; 678 NW2d 631 (2004). We review his unpreserved challenges for plain error affecting his substantial rights. *Brown*, 294 Mich App at 382.

## A. APPEALS TO SYMPATHY

Defendant contends that the prosecutor improperly appealed to the jury's sympathy for the victim by referring to her ruined childhood and her suffering through trial. In his opening statement, the prosecutor stated:

> James T. Walsh once said that sexual abuse and exploitation of children is the most vicious crime conceivable. It's a violation of mankind's most basic duty, to protect the innocent. Think of your childhood. Think of yourself in the ages of eight to 13. Think of yourself outside, running, playing with friends, enjoying your life being a child.

> The testimony that you're going to hear from [Kr] is much different than what you remember being a child. She's going to tell you that she has nightmares. She has post-traumatic stress disorder. She thinks about the person that took her innocence away everyday of her life, eight to 13 years old.

In closing argument, the prosecutor stated, "Well, ladies and gentlemen, I'd suggest to you there might be some humanity in murder because [Kr] has to live with her scars for the rest of her life. She has to live with nightmares." During his examination of Abro in the midst of the trial, the prosecutor asked Abro if the victim told him that "she can't wait to come to court and be berated by questions about her sexual abuse[.]"

"A prosecutor may not appeal to the jury to sympathize with the victim." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). However, even if improper, the

19

prosecutor's statements were "relatively brief and did not likely deflect the jury's attention from the evidence presented in this case." *Id*. Ultimately, the court instructed the jury that "[t]he lawyers' statements and arguments and commentary are not evidence," "[y]ou should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge," and that it "must not let sympathy or prejudice influence [its] decision." Jurors are presumed to follow their instructions. *Id*. And these instructions were sufficient to protect defendant's substantial rights.

## B. DENIGRATION OF DEFENSE COUNSEL

Defendant next argues that the prosecutor improperly denigrated defendant's trial counsel. The prosecutor asked Abro, "Your alternative hypotheses, in the course of your investigations, did you delve into this whole liar, liar, pants on fire defense," referring to defendant's theory that Kr was lying and invented the allegations against him.

In his rebuttal closing argument, the prosecutor stated:

> Well, ethics, conscience, those are all pretty harsh words. Hell hath no furry [sic] of that of a defense attorney.

> Now you know why it's so difficult for somebody to say that they were raped. Now you know why [Kr] took so long to say that she was raped. Thank God she's not in this courtroom today. Thank God she didn't have to listen to this person call her a liar. Thank God she didn't have to see this, because you can't rely on this.

After closing arguments, defendant moved for a mistrial based on the prosecutor's argument that "hell hath no furry [sic] like a defense attorney." Defendant's challenge in the trial court was less than clear:

> In rebuttal argument the prosecutor says, hell hath no furry [sic] like a defense attorney. . . . Our system is designed for people to be represented by attorneys. And I'm not sure the need for the insult. Essentially, what he's saying is this is hell, having a defense attorney. And the system is designed around people being represented by counsel. That's what the Sixth Amendment says. There was no need for that comment. I'm sure the jury heard it. Some of them might think I must be a bad guy.

The trial court "didn't take [the statement] to infer that or insinuate that at all" and denied defendant's motion.

Defendant's challenge in the trial court made little sense. In hindsight, the prosecutor's comments suggest that Kr took so long to report her abuse because she feared that people would not believe her and would attack her. The prosecutor inferred that defense counsel doled out that kind of treatment and made insensitive arguments in closing that would have emotionally damaged Kr had she been present in court. Interpreted correctly, we do find disturbing the prosecutor's reference to "hell hath no fury" like "a defense attorney." In this way, the prosecutor interfered with defendant's right to counsel and to present a defense.

20

We find instructive *People v Hunt*, 68 Mich App 145; 242 NW2d 45 (1976), in this regard. In *Hunt*, 68 Mich App at 148, the prosecutor stated that "as a prosecutor, his job was 'to see that justice is done' while defense counsel's job was 'to get his man acquitted.'" This Court found the comments "unwarranted and wholly unnecessary" and after reviewing the entire record, "conclude[d] that the remarks were part of a deliberate course of conduct." *Id*. at 149. As such, this Court vacated the defendant's convictions and ordered a new trial. *Id*.

The prosecutor's comment in this case was relatively brief and had defendant objected at the time of the comment instead of waiting until the close of arguments, the trial court could have provided a contemporaneous curative instruction. See *Unger*, 278 Mich App at 235. In any event, the comment was improper and the prosecutor is warned to avoid such statements on retrial.

However, we find no error in the prosecutor's question to Abro. Although "[a] prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury," *Id*. at 236, the statement merely described the defense's theory of the case, which was that the victim was lying.

## C. STATING FACTS NOT SUPPORTED BY THE EVIDENCE

Defendant contends that the prosecutor argued facts not supported by the evidence. During his cross-examination of Deputy Anthony Romita, *defense counsel* asked, "Everyday, eight and nine years of age, a guy's penis in an eight-year-old girl's vagina. *Should be some injuries*, right?" The prosecutor objected, "it's specifically contrary to science, and Mr. Kaplan knows it." The trial court overruled the objection. The following exchange then occurred:

*Q*. (By Mr. Kaplan) Do you know any science that says a girl's who's sexually penetrated --

*The Court*. Mr. Kaplan, not appropriate questions. Ask questions for this deputy, not an expert who's not here.

*Mr. Kaplan*. Thank you. And I would ask you to strike that statement of the attorney, that he says there's some science.

*The Court*. We need to strike a lot of statements from both attorneys. Please remember, the attorneys -- evidence comes from the witness stand, not from the attorneys. Questions on both sides that assume things that not in evidence. Thank you.

"A prosecutor may not make a statement of fact to the jury that is not supported by evidence presented at trial and may not argue the effect of testimony that was not entered into evidence." *Id*. at 241. The prosecutor's statement that it was "contrary to science" that a victim should have injuries was not supported by any evidence presented at the trial. However, defense counsel's question suggested that there would be injury, which also was not supported by any evidence and was not a proper question for the police officer. Thus, viewed in context, the prosecutor's improper statement was responsive to the defense counsel's improper question. On remand, both sides are free to seek out expert witnesses to support their theory.

21

## D. VOUCHING FOR THE CREDIBILITY OF A WITNESS

Defendant argues that the prosecutor improperly vouched for Kr's credibility. In closing argument, the prosecutor stated, "She doesn't care what happens here" and "She doesn't want to be here." In rebuttal argument, the prosecutor continued, "She didn't want this, but it was forced on her." The prosecutor also asked Sergeant Abro if he had any reason to believe Kr. The trial court sustained defense counsel's objection to that question.

In *Thomas*, 260 Mich App at 455, this Court observed:

> [A] prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness. But a prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes. [Citations omitted.]

Although the prosecutor's comments did suggest that Kr was credible, they were made during closing and emphasized the prosecutor's theory regarding the conflicting stories presented by the parties. This scenario falls squarely within the parameters of *Thomas* and we discern no error. With regard to the prosecutor's question to Abro, defense counsel objected before any improper response was given. Accordingly, there is no basis for concluding that the question denied defendant a fair trial.[8]

## XI. JURY INSTRUCTIONS

Defendant argues that he was denied a fair trial by the court's jury instructions, advising that an assault does not require an actual injury. We review for an abuse of discretion a trial court's determination that a particular jury instruction is applicable to the facts of the case and review de novo any underlying legal issues. *People v Guajardo*, 300 Mich App 26, 34; 832 NW2d 409 (2013).

In *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007), this Court explained:

> A defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her. The trial court's role is to clearly present the case to the jury and to instruct it on the applicable law. Jury instructions must include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence. Jury instructions are reviewed in their entirety, and there is no error requiring reversal if the instructions sufficiently protected the rights of the defendant and fairly presented the triable issues to the jury. [Citations omitted.]

---

[8] As defendant is entitled to a new trial based on the suppression of evidence, we need not consider his claim that he is entitled to a new trial based on the cumulative effect of several instances of prosecutorial misconduct.

At trial, the prosecutor argued that CSC is an assaultive crime and requested that the court provide M Crim JI 17.16, which provides that "[a]n assault does not have to cause an actual injury." Defendant argued that the elements of the charged CSC offenses did not include assault. The trial court ruled that it would give the instruction, and instructed the jury that "[a]n assault does not have to cause an actual injury."

M Crim JI 17.16 is part of Chapter 17 of the Michigan Model Criminal Jury Instructions, which is titled, "Assault." Accordingly, we agree with defendant that it is intended be given in cases in which the defendant is charged with an assault crime. In this case, defendant was charged with fist-degree CSC, which is covered by a different chapter (Chapter 20) of the instructions. Moreover, assault is not an element of first-degree CSC as charged. Thus, the assault instruction was not proper. Although the error was not outcome determinative and would not have merited a new trial standing alone, we advise the trial court not to repeat this mistake on retrial.

In Docket No. 327796, we affirm defendant's witness intimidation convictions and sentences. In Docket No. 327799, we vacate defendant's CSC convictions and remand for a new trial. We do not retain jurisdiction.


/s/ Douglas B. Shapiro
/s/ Elizabeth L. Gleicher

23