# SUPREME COURT OF THE UNITED STATES

## MICHAEL WEARRY *v.* BURL CAIN, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT
COURT OF LOUISIANA, LIVINGSTON PARISH

No. 14–10008.   Decided March 7, 2016

PER CURIAM.

Michael Wearry is on Louisiana's death row.  Urging that the prosecution failed to disclose evidence supporting his innocence and that his counsel provided ineffective assistance at trial, Wearry unsuccessfully sought postconviction relief in state court.  Contrary to the state postconviction court, we conclude that the prosecution's failure to disclose material evidence violated Wearry's due process rights.  We reverse the state postconviction court's judgment on that account, and therefore do not reach Wearry's ineffective-assistance-of-counsel claim.

## I

## A

Sometime between 8:20 and 9:30 on the evening of April 4, 1998, Eric Walber was brutally murdered.  Nearly two years after the murder, Sam Scott, at the time incarcerated, contacted authorities and implicated Michael Wearry.  Scott initially reported that he had been friends with the victim; that he was at work the night of the murder; that the victim had come looking for him but had instead run into Wearry and four others; and that Wearry and the others had later confessed to shooting and driving over the victim before leaving his body on Blahut Road.  In fact, the victim had not been shot, and his body had been found on Crisp Road.

Scott changed his account of the crime over the course of four later statements, each of which differed from the others in material ways.  By the time Scott testified as the

State's star witness at Wearry's trial, his story bore little resemblance to his original account. According to the version Scott told the jury, he had been playing dice with Wearry and others when the victim drove past. Wearry, who had been losing, decided to rob the victim. After Wearry and an acquaintance, Randy Hutchinson, stopped the victim's car, Hutchinson shoved the victim into the cargo area. Five men, including Scott, Hutchinson, and Wearry, proceeded to drive around, at one point encountering Eric Brown—the State's other main witness—and pausing intermittently to assault the victim. Finally, Scott related, Wearry and two others killed the victim by running him over. On cross-examination, Scott admitted that he had changed his account several times.

Consistent with Scott's testimony, Brown testified that on the night of the murder he had seen Wearry and others with a man who looked like the victim. Incarcerated on unrelated charges at the time of Wearry's trial, Brown acknowledged that he had made a prior inconsistent statement to the police, but had recanted and agreed to testify against Wearry, not for any prosecutorial favor, but solely because his sister knew the victim's sister. The State commented during its opening argument that Brown "is doing 15 years on a drug charge right now, [but] hasn't asked for a thing." 7 Record 1723 (Tr., Mar. 2, 2002). During closing argument, the State reiterated that Brown "has no deal on the table" and was testifying because the victim's "family deserves to know." Pet. for Cert. 19.

Although the State presented no physical evidence at trial, it did offer additional circumstantial evidence linking Wearry to the victim. One witness testified that he saw Wearry in the victim's car on the night of the murder and, later, holding the victim's class ring. Another witness said he saw Wearry throwing away the victim's cologne. In some respects, however, these witnesses contradicted Scott's account. For example, the witness who

reported seeing Wearry in the victim's car did not place Scott in the car.

Wearry's defense at trial rested on an alibi. He claimed that, at the time of the murder, he had been at a wedding reception in Baton Rouge, 40 miles away. Wearry's girlfriend, her sister, and her aunt corroborated Wearry's account. In closing argument, the State stressed that all three witnesses had personal relationships with Wearry. The State also presented two rebuttal witnesses: the bride at the wedding, who reported that the reception had ended by 8:30 or 9:00 (potentially leaving sufficient time for Wearry to have committed the crime); and three jail employees, who testified that they had overheard Wearry say that he was a bystander when the crime occurred.

The jury convicted Wearry of capital murder and sentenced him to death. His conviction and sentence were affirmed on direct appeal.[1]

B

After Wearry's conviction became final, it emerged that the prosecution had withheld relevant information that could have advanced Wearry's plea. Wearry argued during state postconviction proceedings that three categories of belatedly revealed information would have undermined the prosecution and materially aided Wearry's defense at trial.

First, previously undisclosed police records showed that two of Scott's fellow inmates had made statements that cast doubt on Scott's credibility. One inmate had reported

_____

[1] Wearry argued, *inter alia*, that the trial court improperly denied his for-cause challenges, and that the prosecution discriminated on the basis of race in jury selection in violation of *Batson* v. *Kentucky*, 476 U. S. 79 (1986). Finding both jury-selection claims credible, then-Justice Johnson dissented from the affirmance of Wearry's conviction. *State* v. *Weary*, 2003–3067 (La. 4/2/06), 931 So. 2d 297, 328–337. (Wearry's name is misspelled in the direct-appeal case caption.)

hearing Scott say that he wanted to "'make sure [Wearry] gets the needle cause he jacked over me.'" *Id.*, at 22 (quoting inmate affidavit).[2] The other inmate had told investigators—at a meeting Scott orchestrated—that he had witnessed the murder, but this inmate recanted the next day. "Scott had told him what to say," he explained, and had suggested that lying about having witnessed the murder "would help him get out of jail." Pet. Exh. 13 in No. 01–FELN–015992, pp. 104, 107. See also Pet. for Cert. 22 (quoting police notes).

Second, the State had failed to disclose that, contrary to the prosecution's assertions at trial, Brown had twice

_____

[2] Illustrative of the liberties the dissent takes with the record is the assertion that "Scott blamed [Wearry] for putting him in the position of having to admit his own role in the events surrounding the murder." *Post,* at 2 (opinion of ALITO, J.). Introducing the inmate's statement, the dissent therefore suggests, might have "backfired by allowing the prosecution to return the jury's focus to a point the State emphasized often during trial, namely, that Scott's accusations were credible precisely because Scott had no motive to tell a story that was contrary to his own interests." *Id.,* at 2–3. True, according to the inmate, Scott had complained that his identification of Wearry had resulted in a lengthier prison term. The inmate, however, did not suggest that Scott was angry with Wearry *because* he had suffered adverse consequences as a result of Wearry's crime. Instead, the inmate separately stated that Scott "wouldn't tell me who did it"—*i.e.,* who killed Eric Walber— "but he said I'm gonna make sure Mike gets the needle cause he jacked over me." Pet. Exh. 13 in No. 01–FELN–015992, p. 103. See also *ibid.* ("If [Scott] would have told me who did this I would tell because I have a heart and what they did wasn't right"). Scott's refusal to identify Wearry as the culprit—while also endeavoring to "make sure Mike gets the needle," *ibid.*—suggests that Wearry did *not* commit the crime, but Scott had decided to bring him down anyway. Nor, contrary to the dissent, is there any reason to believe that Scott anticipated his participation in this case would cost him additional years in prison. Notably, in the first of his five accounts to police, Scott reported that he had not been present at the time of the murder and had learned about it only after the fact. Indeed, it is at least as plausible as the dissent's hypothesis that Scott believed implicating Wearry might win him early release on his existing conviction.

sought a deal to reduce his existing sentence in exchange for testifying against Wearry. The police had told Brown that they would "'talk to the D. A. if he told the truth.'" Pet. for Cert. 19 (quoting police notes).

Third, the prosecution had failed to turn over medical records on Randy Hutchinson. According to Scott, on the night of the murder, Hutchinson had run into the street to flag down the victim, pulled the victim out of his car, shoved him into the cargo space, and crawled into the cargo space himself. But Hutchinson's medical records revealed that, nine days before the murder, Hutchinson had undergone knee surgery to repair a ruptured patellar tendon. *Id.,* at 10–11, 15–16, 32.[3] An expert witness, Dr. Paul Dworak, testified at the state collateral-review hearing that Hutchinson's surgically repaired knee could not have withstood running, bending, or lifting substantial weight. The State presented an expert witness who disagreed with Dr. Dworak's appraisal of Hutchinson's physical fitness.

During state postconviction proceedings, Wearry also maintained that his trial attorney had failed to uncover exonerating evidence. Wearry's trial attorney admitted at the state collateral-review hearing that he had conducted no independent investigation into Wearry's innocence and had relied solely on evidence the State and Wearry had provided.[4] For example, despite Wearry's alibi, his attor-

––––––––

[3] The dissent emphasizes a State's witness' testimony that "Hutchinson had had surgery on his knee 'about nine days before the homicide happened.'" *Post,* at 4 (quoting 10 Record 2261 (Tr., Mar. 5, 2002)). But from this witness' statement, neither Wearry nor the jury had any way of knowing what the medical records would have revealed: Hutchinson had undergone a patellar-tendon repair rather than a routine minor procedure.

[4] Wearry's trial attorney did ask the public defender's investigator to look into the backgrounds of the State's witnesses and to speak with Wearry's family members. But the attorney testified at the collateral-review hearing that he did not know what persons the investigator

ney undertook no effort to locate independent witnesses from among the dozens of guests who had attended the wedding reception.

Counsel representing Wearry on collateral review conducted an independent investigation. This investigation revealed many witnesses lacking any personal relationship with Wearry who would have been willing to corroborate his alibi had they been called at trial. Collateral-review counsel's investigation also revealed that Scott's brother and sister-in-law would have been willing to testify at trial, as they did at the collateral-review hearing, that Scott was with them, mostly at a strawberry festival, until around 11:00 on the night of the murder.

Based on this new evidence, Wearry alleged violations of his due process rights under *Brady* v. *Maryland*, 373 U. S. 83 (1963), and of his Sixth Amendment right to effective assistance of counsel. Acknowledging that the State "probably ought to have" disclosed the withheld evidence, App. to Pet. for Cert. B–6, and that Wearry's counsel provided "perhaps not the best defense that could have been rendered," *id.,* at B–5, the postconviction court denied relief. Even if Wearry's constitutional rights were violated, the court concluded, he had not shown prejudice. *Id.,* at B–5, B–7. In turn, the Louisiana Supreme Court also denied relief. *Id.,* at A–1. Chief Justice Johnson would have granted Wearry's petition on the ground that he received ineffective assistance of counsel. *Id.,* at A–2.[5]

––––––––––

contacted and, in any event, he had serious doubts about the investigator's qualifications and competence. Moreover, there is no indication that the investigator ever engaged in inquiries regarding Scott's background or his whereabouts on the night of the murder.

[5] Justice Crichton would have granted Wearry's petition and remanded for the trial court to address his claim of intellectual disability under *Atkins* v. *Virginia*, 536 U. S. 304 (2002). App. to Pet. for Cert. A–15. Wearry does not raise his *Atkins* claim in his petition for a writ of certiorari.

## II

Because we conclude that the Louisiana courts' denial of Wearry's *Brady* claim runs up against settled constitutional principles, and because a new trial is required as a result, we need not and do not consider the merits of his ineffective-assistance-of-counsel claim. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, supra,* at 87. See also *Giglio* v. *United States,* 405 U. S. 150, 153–154 (1972) (clarifying that the rule stated in *Brady* applies to evidence undermining witness credibility). Evidence qualifies as material when there is "'any reasonable likelihood'" it could have "'affected the judgment of the jury.'" *Giglio, supra,* at 154 (quoting *Napue* v. *Illinois,* 360 U. S. 264, 271 (1959)). To prevail on his *Brady* claim, Wearry need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith* v. *Cain,* 565 U. S. 73, ___–___ (2012) (slip op., at 2–3) (internal quotation marks and brackets omitted). He must show only that the new evidence is sufficient to "undermine confidence" in the verdict. *Ibid.*[6]

Beyond doubt, the newly revealed evidence suffices to undermine confidence in Wearry's conviction. The State's trial evidence resembles a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi. See *United States* v. *Agurs,* 427 U. S. 97, 113 (1976) ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt."). The dissent asserts

_____

[6] Given this legal standard, Wearry can prevail even if, as the dissent suggests, the undisclosed information may not have affected the jury's verdict.

that, apart from the testimony of Scott and Brown, there
was independent evidence pointing to Wearry as the mur-
derer. See *post,* at 5 (opinion of ALITO, J.). But all of the
evidence the dissent cites suggests, at most, that someone
in Wearry's group of friends may have committed the
crime, and that Wearry may have been involved in events
related to the murder *after* it occurred. Perhaps, on the
basis of this evidence, Louisiana might have charged
Wearry as an accessory after the fact. La. Rev. Stat. Ann.
§14:25 (West 2007) (providing a maximum prison term of
five years for accessories after the fact). But Louisiana
instead charged Wearry with capital murder, and the only
evidence directly tying him to that crime was Scott's dubi-
ous testimony, corroborated by the similarly suspect tes-
timony of Brown.[7]

As the dissent recognizes, "Scott did not have an exem-
plary record of veracity." *Post,* at 3. Scott's credibility,
already impugned by his many inconsistent stories, would
have been further diminished had the jury learned that
Hutchinson may have been physically incapable of per-
forming the role Scott ascribed to him, that Scott had
coached another inmate to lie about the murder and
thereby enhance his chances to get out of jail, or that Scott
may have implicated Wearry to settle a personal score.[8]

––––––––––

[7] As for the three jailers who testified to overhearing Wearry call
himself an "innocent bystander," *post,* at 4, so characterizing oneself is
the opposite of an admission of guilt.

[8] Because the inmate who told police that Scott may have wanted to
settle a score did so close to the end of trial, the State argues, the
inmate's "statement was probably . . . never seen by anyone involved
with the actual trial until . . . it was [all] over, i[f] at all." Brief in
Opposition 18. But "*Brady* suppression occurs when the government
fails to turn over even evidence that is known only to police investiga-
tors and not to the prosecutor." *Youngblood* v. *West Virginia*, 547 U. S.
867, 869–870 (2006) (*per curiam*) (internal quotation marks omitted).
See also *Kyles* v. *Whitley*, 514 U. S. 419, 438 (1995) (rejecting Louisi-
ana's plea for a rule that would not hold the State responsible for

Moreover, any juror who found Scott more credible in light of Brown's testimony might have thought differently had she learned that Brown may have been motivated to come forward not by his sister's relationship with the victim's sister—as the prosecution had insisted in its closing argument—but by the possibility of a reduced sentence on an existing conviction. See *Napue*, *supra*, at 270 (even though the State had made no binding promises, a witness' attempt to obtain a deal before testifying was material because the jury "might well have concluded that [the witness] had fabricated testimony in order to curry the [prosecution's] favor"). Even if the jury—armed with all of this new evidence—*could* have voted to convict Wearry, we have "no confidence that it *would* have done so." *Smith*, *supra*, at \_\_\_ (slip op., at 3).

Reaching the opposite conclusion, the state postconviction court improperly evaluated the materiality of each piece of evidence in isolation rather than cumulatively, see *Kyles* v. *Whitley*, 514 U. S. 419, 441 (1995) (requiring a "cumulative evaluation" of the materiality of wrongfully withheld evidence), emphasized reasons a juror might disregard new evidence while ignoring reasons she might not, cf. *Porter* v. *McCollum*, 558 U. S. 30, 43 (2009) (*per curiam*) ("it was not reasonable to discount entirely the effect that [a defendant's expert's] testimony might have had on the jury" just because the State's expert provided contrary testimony), and failed even to mention the statements of the two inmates impeaching Scott.

### III

In addition to defending the judgment of the Louisiana courts, the dissent criticizes the Court for deciding this "intensely factual question . . . without full briefing and

––––––––––

failing to disclose exculpatory evidence about which prosecutors did not learn until after trial when that evidence was in the possession of police investigators at the time of trial).

argument." *Post,* at 6. But the Court has not shied away
from summarily deciding fact-intensive cases where, as
here, lower courts have egregiously misapplied settled
law. See, *e.g., Mullenix* v. *Luna, ante,* at ___ (*per
curiam*); *Stanton* v. *Sims,* 571 U. S. ___ (2013) (*per curiam*);
*Parker* v. *Matthews,* 567 U. S. ___ (2012) (*per curiam*);
*Coleman* v. *Johnson,* 566 U. S. ___ (2012) (*per curiam*);
*Wetzel* v. *Lambert,* 565 U. S. ___ (2012) (*per curiam*);
*Ryburn* v. *Huff,* 565 U. S. ___ (2012) (*per curiam*); *Sears* v.
*Upton,* 561 U. S. 945 (2010) (*per curiam*); *Porter* v.
*McCollum, supra.*

Because "[t]he petition does not . . . fall into a category
in which the Court has previously evinced an inclination
to police factbound errors," the dissent continues, "nothing
warned the State," when it was drafting its brief in opposi-
tion, that the Court might summarily reverse Wearry's
conviction. *Post,* at 5–6. Contrary to the dissent, however,
summarily deciding a capital case, when circumstances so
warrant, is hardly unprecedented. See *Sears, supra,* at
951–952 (vacating a state postconviction court's denial of
relief on a penalty-phase ineffective-assistance-of-counsel
claim); *Porter, supra,* at 38–40 (attorney provided ineffec-
tive assistance of counsel by conducting a constitutionally
inadequate investigation into mitigating evidence). Per-
haps anticipating the possibility of summary reversal, the
State devoted the bulk of its 30-page brief in opposition to
a point-by-point rebuttal of Wearry's claims. Given this
brief, as well as the State's lower court filings similarly
concentrating on evidence supporting its position, the
chances that further briefing or argument would change
the outcome are vanishingly slim.

The dissent also inveighs against the Court's "de-
part[ure] from our usual procedures . . . [to] decide peti-
tioner's fact-intensive *Brady* claim at this stage . . . [rather
than] allow[ing] petitioner to raise that claim in a federal
habeas proceeding." *Post,* at 7. This Court, of course, has

Per Curiam

jurisdiction over the final judgments of state postconviction courts, see 28 U. S. C. §1257(a), and exercises that jurisdiction in appropriate circumstances. Earlier this Term, for instance, we heard argument in *Foster* v. *Chatman*, No. 14–8349, which involves the Georgia courts' denial of postconviction relief to a capital defendant raising a claim under *Batson* v. *Kentucky*, 476 U. S. 79 (1986). See also *Smith*, 565 U. S., at \_\_\_ (slip op., at 2) (reversing a state postconviction court's denial of relief on a *Brady* claim); *Sears, supra,* at 946. Reviewing the Louisiana courts' denial of postconviction relief is thus hardly the bold departure the dissent paints it to be. The alternative to granting review, after all, is forcing Wearry to endure yet more time on Louisiana's death row in service of a conviction that is constitutionally flawed.

\*    \*    \*

Because Wearry's due process rights were violated, we grant his petition for a writ of certiorari and motion for leave to proceed *in forma pauperis*, reverse the judgment of the Louisiana postconviction court, and remand for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

## MICHAEL WEARRY *v.* BURL CAIN, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE DISTRICT
COURT OF LOUISIANA, LIVINGSTON PARISH

No. 14–10008.    Decided March 7, 2016

JUSTICE ALITO, with whom JUSTICE THOMAS joins,
dissenting.

Without briefing or argument, the Court reverses a 14-
year-old murder conviction on the ground that the prose-
cution violated *Brady* v. *Maryland*, 373 U. S. 83 (1963), by
failing to turn over certain information that tended to
exculpate petitioner.  There is no question in my mind
that the prosecution should have disclosed this infor-
mation, but whether the information was sufficient to
warrant reversing petitioner's conviction is another mat-
ter.   The failure to turn over exculpatory information
violates due process only "'if there is a reasonable proba-
bility that, had the evidence been disclosed to the defense,
the result of the proceeding would have been different.'"
*Kyles* v. *Whitley*, 514 U. S. 419, 433–434 (1995) (quoting
*United States* v. *Bagley,* 473 U. S. 667, 682 (1985) (opinion
of Blackmun, J.)).

The Court argues that the information in question here
could have affected the jury's verdict and that petitioner's
conviction must therefore be reversed.  The Court ably
makes the case for reversal, but there is a reasonable
contrary argument that petitioner's conviction should
stand because the undisclosed information would *not* have
affected the jury's verdict.  I will briefly discuss the main
points made in the *per curiam*, not for the purpose of
showing that they are necessarily wrong, but to show that
the *Brady* issue is not open and shut.  For good reason, we
generally do not decide cases without allowing the parties
to file briefs and present argument.  Questions that seem

quite simple at first glance sometimes look very different after both sides are given a chance to make their case. Of course, this process means extra work for the Court. But it leads to better results, and it gives the losing side the satisfaction of knowing that at least its arguments have been fully heard. There is no justification for departing from our usual procedures in this case.

I

The first item of information discussed by the Court is a police report that recounts statements made about Sam Scott, a key witness for the prosecution, by a fellow inmate. According to this report, Scott told the inmate: "I'm gonna make sure Mike [*i.e.,* petitioner] gets the needle cause he jacked over me." Pet. Exh. 13 in No. 01–FELN–015992, p. 103. Scott, who had been serving a sentence on unrelated drug charges, reportedly told the inmate that he had been expecting to be released but that he "still [had not] gone home because of this," *i.e.,* petitioner's prosecution. *Id.,* at 102. As stated in the report, Scott said that he was now facing the possibility of a 10-year sentence, apparently for his admitted role in the events surrounding the murder. The report did not provide any further explanation for Scott's alleged statement that petitioner had "jacked [him] over."

The Court reads the report to suggest that Scott implicated petitioner in the murder "to settle a personal score." *Ante,* at 8. But if petitioner's counsel had actually attempted to use this evidence at trial, the net effect might well have been harmful, not helpful, to the defense. The undisclosed police report on which the Court relies may be read to mean that Scott blamed petitioner for putting him in the position of having to admit his own role in the events surrounding the murder and thereby expose himself to the 10-year sentence and lose an opportunity to secure early release from prison on the drug charges. If

defense counsel had attempted to impeach Scott with this police report, the effort could have backfired by allowing the prosecution to return the jury's focus to a point the State emphasized often during trial, namely, that Scott's accusations were credible precisely because Scott had no motive to tell a story that was contrary to his own interests. See, *e.g.,* 10 Record 2307 (Tr., Mar. 5, 2002) ("If [Scott] keeps his mouth shut, he is out in less than five more months. . . . [But] [i]nstead of getting out in 180 days, he is going to be doing more time").[1]

The Court next turns to an allegation that Scott had coached another prisoner to make up lies against petitioner. This prisoner never testified at trial, and there is a basis for arguing that this information would not have made a difference to the jury, which was well aware that Scott did not have an exemplary record of veracity. Scott himself admitted to fabricating information that he told the police during their investigations. In addition, a witness who *did* testify against petitioner at trial also accused Scott of asking him to lie, although admittedly this witness later denied making this accusation. Given that the jury convicted even with these quite serious strikes against Scott's credibility, there is reason to question whether the jury would have seriously considered a different verdict because of an accusation from someone who never took the stand.

Third, the Court observes that the prosecution failed to turn over evidence that another witness, Eric Brown, had

———————

[1] The majority claims that Scott's unwillingness to tell this fellow inmate who killed the victim somehow exculpates petitioner. See *ante,* at 4, n. 2. In my view, one cannot reasonably infer from the inmate's statement, "[Scott] wouldn't tell me who did it but he said I'm gonna make sure Mike gets the needle cause he jacked over me," that Scott believed petitioner Michael Wearry to be innocent—especially against the backdrop of Scott's complaints about his increased imprisonment. Pet. Exh. 13 in No. 01–FELN–015992, p. 103.

asked for favorable treatment from the district attorney in exchange for testifying against petitioner. It is true—and troubling—that the prosecutor claimed in her opening statement that Brown had not sought favorable treatment. But even so, it is far from clear that disclosing the contradictory information had real potential to affect the trial's outcome. For one thing, there is no evidence that Brown (unlike Scott) actually received any deal, despite defense counsel's efforts in cross-examination to establish that Brown's testimony might have earned him leniency from the State. Moreover, Brown admitted during the exchange that he had manipulated his initial story to the police to avoid implicating himself in criminal activity. We know, then, that the jury harbored no illusions about the purity of Brown's motives, notwithstanding the prosecutor's opening misstatement.

Finally, the Court says that the medical records of Randy Hutchinson would have cast doubt on Scott's trial testimony that Hutchinson repeatedly dragged the victim into and out of a car and bludgeoned him with a stick. The records reveal that Hutchinson had knee surgery to repair his patellar tendon just nine days before the murder. But one of the State's witnesses testified at trial that he had seen records showing that Hutchinson had had surgery on his knee "about nine days before the homicide happened." 10 Record 2261 (Tr., Mar. 5, 2002); see also *id.,* at 2263. The jury thus knew the most salient fact revealed by these records—that Scott had attributed significant strength and mobility to a man nine days removed from knee surgery.[2] Given that these particular

––––––––

[2] The *per curiam* argues that the medical records might have had a greater effect on the jury because they mentioned the particular type of knee surgery that petitioner had undergone, and that is certainly possible. But what is important at this stage is that the basic fact— that petitioner had recently undergone knee surgery—was known to the jury, and the incremental impact of the additional details supplied

details about Hutchinson's actions were a relatively minor part of Scott's account of the crime and the State's case against petitioner, the significance of the undisclosed medical records is subject to reasonable dispute.

While the Court highlights the exculpatory quality of the withheld information, the Court downplays the considerable evidence of petitioner's guilt. Aside from Scott's and Brown's testimony, three witnesses told the jury that they saw petitioner and others driving around shortly after the murder in the victim's red car, which according to one of these witnesses had blood on its exterior. Petitioner offered to sell an Albany High School class ring to one of these witnesses and a set of new speakers to another. The third witness said he saw petitioner throw away a bottle of Tommy Hilfiger cologne. Meanwhile, the victim's mother testified that her son wore an Albany High class ring that was not recovered with his body, had received speakers as a gift shortly before his murder, and had a bottle of Tommy Hilfiger cologne with him on the night when he was killed. In addition, three jailers testified that petitioner called his father after his eventual arrest and stated that "he didn't know what he was doing in jail because he didn't do anything [and] was just an innocent bystander." 9 Record 2120 (Tr., Mar. 4, 2002); see also *id.,* at 2124, 2126.

In short, this is far from a case in which the withheld information would have allowed the defense to undermine "the *only* evidence linking [petitioner] to the crime." *Smith* v. *Cain*, 565 U. S. 73, \_\_\_ (2012) (slip op., at 3).

## II

Whether disclosing the information at issue realistically

---

by the medical records is far from clear. Even at the postconviction evidentiary hearing, the defense's and State's medical experts disagreed about whether the particular procedure at issue would have left the then-20-year-old Hutchinson incapable of the acts Scott described.

could have changed the trial's outcome is indisputably an intensely factual question. Under *Brady*, we must evaluate the significance of the withheld information in light of *all* the proof at petitioner's trial. See *Kyles*, 514 U. S., at 435 (*Brady* is violated when the withheld "evidence could reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict" (emphasis added)); *United States* v. *Agurs*, 427 U. S. 97, 112 (1976) (*Brady* materiality "must be evaluated in the context of *the entire record*" (emphasis added)). It is unusual and, in my judgment, unreasonable for us to decide such a question without full briefing and argument.

At this stage, all that we have from the State is its brief in opposition to the petition for certiorari. And the State had ample reason to believe when it submitted that brief that the question on the table was whether the Court should hear the case, not whether petitioner's conviction should be reversed. The State undoubtedly knew that we generally deny certiorari on factbound questions that do not implicate any disputed legal issue. See, *e.g.,* this Court's Rule 10; S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice §5.12(c)(3), p. 352 (10th ed. 2013). Nothing warned the State that this petition was likely to produce an exception to that general rule. The petition does not, for instance, fall into a category in which the Court has previously evinced an inclination to police factbound errors. Cf. *Cash* v. *Maxwell*, 565 U. S. ___, ___ (2012) (Scalia, J., dissenting from denial of certiorari) (slip op., at 8) (listing cases from one such category).

To the contrary, we have previously told litigants that petitions like the one here, challenging a state court's denial of postconviction relief, are particularly *unlikely* to be granted: We "'rarely gran[t] review at this stage'" of litigation, even when a petition raises "'arguably meritorious federal constitutional claims,'" because we prefer that

the claims be reviewed first by a district court and court of appeals in a federal habeas proceeding. *Lawrence* v. *Florida*, 549 U. S. 327, 335 (2007) (quoting *Kyles* v. *Whitley*, 498 U. S. 931, 932 (1990) (Stevens, J., concurring in denial of stay of execution)).[3]

Why, then, has the Court decided to depart from our usual procedures and decide petitioner's fact-intensive *Brady* claim at this stage? Why not allow petitioner to raise that claim in a federal habeas proceeding? If the case took that course, it would not reach us until a district court and a court of appeals had studied the record and evaluated the likely impact of the information in question.

One consequence of waiting until the claim was raised in a federal habeas proceeding is that our review would then be governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, relief could be granted only if it could be said that the state court's rejection of the claim represented an "unreasonable application" of *Brady*. 28 U. S. C. §2254(d)(1). By intervening now before AEDPA comes into play, the Court avoids the application of that standard and is able to exercise plenary review. But if the *Brady* claim is as open-and-shut as the Court maintains, AEDPA would not present an obstacle to the granting of habeas relief. On the other hand, if reasonable jurists could disagree about the application of *Brady* to the facts of this case, there is no good reason to dispose of this case summarily. The State

―――――――

[3] The Court implies that meritorious claims in capital cases do constitute a category of factbound errors that the Court has shown willingness to correct on certiorari papers alone. *Ante,* at 10. In support, it cites *Sears* v. *Upton*, 561 U. S. 945 (2010) (*per curiam*), and *Porter* v. *McCollum*, 558 U. S. 30 (2009) (*per curiam*). Notably, *Porter* did not arise directly from state postconviction proceedings, but in federal habeas. And in neither case did the Court take the dramatic step it takes here and summarily reverse a long-final state conviction for capital murder; both cases addressed errors related to the defendants' sentences.

should be given the opportunity to make its full case.

In my view, therefore, summary reversal is highly inappropriate. The Court is anxious to vacate petitioner's conviction before the State has the opportunity to make its case. But if we are going to intervene at this stage, we should grant the petition and hear the case on the merits. There is room on our docket to give this case the careful consideration it deserves.